## MIKULIK v. SOUTHWESTERN SPECIAL-
## TY CO.
### No. 2337.

Court of Civil Appeals of Texas. Beaumont.
April 12, 1933.

Rehearing Denied April 19, 1933.

Bliss & Daffan, of San Antonio, for appellant.

Church & Graves and Meritt Steger, all of San Antonio, for appellee.

WALKER, Chief Justice.

This suit was filed in county court at Law No. 2 of Bexar county on the 20th of November, 1930, by appellee, Southwestern Specialty Company, Inc., against appellant, J. B. Mikulik, upon an open account for $44.06 and a promissory note executed by appellant to appellee for $935, dated the 20th day of August, 1929, payable in monthly installments of $40, beginning one month after date, with interest at 8 per cent. and the usual attorney's fee and acceleration clauses, with 10 per cent. interest per annum upon all past-due payments; immediately after the execution of the note appellant made a payment thereon of $150. Appellee also made the following allegations as to the execution of a chattel mortgage to secure the payment of the account and note:

"That for the purpose of securing the above described note in the principal sum of $935.00 dated August 20th, 1929, the maker of the said note Edinburg Bakery, by W. B. Mikulik, made, executed and delivered to this plaintiff his one certain chattel mortgage to one Artofex one-barrel mixer and all parts and attachments; that said chattel mortgage is a valid lien against the said property in favor of this plaintiff.

"That said chattel mortgage provides that it is to secure any further indebtedness of the maker of the said chattel mortgage.

"That the said Artofex one-barrel mixer and all parts and attachments is of the present reasonable market value of $700.00."

The prayer was for judgment for the amount of the open account, with interest at 10 per cent. per annum from January 1, 1930, for the principal amount of the note less the payment of $150, with interest at the rate of 10 per cent. per annum from January 1, 1930, and 10 per cent. additional as attorney's fees and for foreclosure of the chattel mortgage lien. The chattel mortgage and sale contract pleaded by appellee was not made an exhibit to the petition, but was pleaded only as stated above. On April 27, 1931, appellant filed his first amended original answer, consisting of general demurrer and general denial and cross-action, as follows: (1) An admission by appellant of the purchase of the Artofex mixer and the execution of the chattel mortgage, as pleaded by appellee. (2) One Watts was the authorized agent of appellee in making the sale; appellant was not a baker by trade, and knew nothing whatsoever about baking machinery; Watts represented to appellant that the Artofex mixer was a high-speed machine, that he was familiar with the kind of machine appellant needed in his business, and that this type of machine would perform his work satisfactorily, and was just what he needed to carry on his business. (3) As soon as the machinery was installed, appellant discovered that it would not do the work; "that said machine, instead of being a high speed mixer, was a low speed mixer, and that the same was not the kind of machine that he wanted; that the machine was incapable of performing the work required of it"; that it was of no use whatsoever to appellant, and it was necessary for him to set it aside and use the old machine in use by him before buying the new one, in order to carry on his business. (4) The old machine was a good low-speed mixer and did appellant's work satisfactorily, but a low-speed mixer did not turn out the quality of bread necessary for appellant to compete with other bakeries; "that his only reason for purchasing said machine was because he thought

the same was a high speed mixer and would turn out the quality of bread necessary to compete in the open market"; the new machine did not perform the work as well as the old low-speed mixer. (5) Appellant immediately notified appellee that the machine "would not do the work of his said bakery, as represented by the said Watts"; that it was of no use to him in the conduct of his business, and demanded that appellee take the machine back, cancel the note executed by him in payment of the machine, and pay back to him the $150, which appellee refused to do. (6) Appellant further pleaded that "he relied on the said representations of the said Watts in purchasing said machine, he having had no knowledge whatsoever about baking machinery, and was induced solely by said representations of the said Watts to purchase said machine." (7) Appellant admitted the justness of the account in the sum of $44.06, and pleaded a willingness that it be credited against the $150 paid on the mixer. The prayer was for rescission of the contract, the cancellation of the note, and the return of the $150, less the amount due on the account. On April 27, 1931, appellee filed its first supplemental petition, consisting of general demurrer, general denial, and special plea as follows:

"That the Artofex Mixer delivered to the defendant herein was machine with high speed mixing results and that any statements made by Watts to the Defendant herein in an attempt to sell said machine were not binding upon the Plaintiff as said Watts did not have any authority whatsoever to bind the Plaintiff herein on any warranty for the work to be done by said above described machine.

"That if said Watts did make the statements alleged in Defendant's pleading which is not herein admitted, then such statements made by Watts were merely statements of his personal opinion and not any statement of fact binding upon this Plaintiff."

We quote as follows from appellant's testimony:

"My name is J. B. Mikulik. I reside at Edinburg, Hidalgo County, Texas, and have been living there about three and a half years. I have a bakery business there and am manager and salesman, I am not a baker, though. During the week days we turn out about eight or nine hundred loaves of bread and on Saturdays about fifteen or sixteen hundred. Prior to August 20, 1929, I had a slow speed dough mixer.

"Q. What do you mean by a low speed mixer? A. Well, a high speed mixer makes a better texture of bread than a low speed mixer.

"At that time I desired a new mixer and I dealt with Mr. Watts, a salesman for The Southwestern Specialty Company, who said he had a good Artofex high speed mixer. At that time I was using a Century low speed mixer, and I bought an Artofex mixer which he said was a high speed mixer. My business needed a high speed machine, and I bought that machine upon his representations. that it was a high speed machine. As to whether I received that machine, I received a machine, but it was not a high speed mixer—I installed it.

"At that time I had been in the bakery business a little better than two years. As to the result of the bread that is turned out by the two machines, the high speed machine turns out a closer grain loaf than a low speed, and better texture—a better loaf of bread—closer grain. In the bakery business they generally use high speed mixers because they turn out better bread. During the time I have been in the bakery business I have noticed the difference between the work of a high speed machine and a low speed machine. I have watched the action of the machines and the product turned out by high and low speed mixers, and have formed an opinion from my examination of the product turned out by the two different machines what the result is in each case, and have formed the opinion that the low speed machine don't make as close a grain of bread as the high speed machine.

"* * * At the time I entered into this contract I would not have purchased that machine if I had known it was a low speed mixer—I would not have purchased it. I paid $150.00 cash money at the time I purchased it. I tried the machine for four days and I found out I couldn't use it and I notified The Southwestern Specialty Company, at San Antonio, by letter, and in reply to that letter they said they would send Mr. Watts down to find out what was the matter with the mixer. Mr. Watts came down and he told me it wasn't a high speed mixer and wouldn't do the work, and he said that he was going to try to sell the machine for me and refund my money, or take it back or make a settlement, which he has not done so far. I am willing to let the plaintiff have the machine if they give me the $150.00 cash I paid them back.

"* * * I stated that Mr. Watts came down there and told me that they would take the machine back and refund my money. Prior to and at the time I bought the machine I did not deal with anybody else in the plaintiff company with reference to the purchase of this machine besides Mr. Watts. He was the only one I dealt with, and when he said they would take the machine back, I thought they would."

Mr. Watts testified for appellee as follows:

"My name is J. T. Watts. I am working for the Southwestern Specialty Company as a salesman, and in the latter part of July, 1929, I was working in the Valley. My ter-

ritory included Edinburg, and I was in Edinburg in July, 1929.

"I entered into a contract for an Artofex machine with Mr. Mikulik—that was the only contract that was entered into at all when I sold him the machine.

"Prior to the time that I sold Mr. Mikulik this Artofex mixing machine, about seven days before he signed that contract, I left with him pamphlets and a catalogue and a lot of references from other large bakeries, and when I came back—worked back from Brownsville—he said he was ready to buy the machine and gave me a check and wanted to know how soon we could get it there; I told him from two to three weeks, and he gave me a check after he signed the contract there for $150.00 on the machine. I believe he asked me to wire for the machine. I told him I was going right on in to San Antonio and we could get better results by sending the order from there for the machine.

"As to whether or not I told Mr. Mikulik that the Artofex was a high speed mixing machine, I told him he got the same results as a high speed mixer—that was what was written on the catalogue at the same time and he saw this catalogue, which I left with him, and it read on there that they got the same results as a high speed mixer.

"I think this pamphlet that you now show me was in the same folder with these different letters and all on it, and other telegrams also, which is in the other book, that I showed to Mr. Mikulik.

"I told him that this machine would have the same results as a high speed mixer and would not heat the dough as a high speed mixer would because it did not require the ice that a high speed mixer would require because it had the arms and revolving bowl at the same time. Every high speed mixer requires a cooling system. They have water jackets and if they haven't water jackets, then they have to put ice in them, depending on the size of the machine—from 70 to 80 pounds of ice is used with every two barrel dough. This Artofex machine does not have any cooling system—it don't require any, and I so advised Mr. Mikulik.

"I did not advise him that this was a high speed mixing machine—I said he got high speed results.

"* * * At the time I sold this machine to Mr. Mikulik I knew that he wanted a high speed machine and that he had a low speed machine.

"* * * Mr. Mikulik did not say anything about this machine not being a high speed mixer until two or three months afterwards. I don't know when he quit using that machine—he said he didn't use it but about a week—I don't know whether he used it any time or not, I never saw the machine in operation. My company did not send me

down there—they knew that I went down there every five or six weeks—they did not send me down there to confer with him with reference to his being dissatisfied with this machine, except Mr. Berman did tell me to go down there and see what I could do with the machine. I hadn't at that time told Mr. Mikulik that I was going to give him his money back—I never did. I did not know that this was not a high speed machine, I absolutely thought it was a high speed machine.

"* * * The difference in the mechanical operation between a high speed and low speed is that a high speed machine gives more revolutions a minute than a low speed. I did not know that machine was not a high speed mixer—it was considered a high speed machine.

"* * * I stated awhile ago that this machine had the results of high speed mixing machines, and it is a fact that regardless of what name you call it, if it has the results of a high speed machine, it absolutely has the results of a high speed mixing machine.

"* * * I claim that this machine gives the same results as a high speed machine—it is the same thing as a high speed machine. I can't say that this machine that Mr. Mikulik got performs high speed work—I never saw it used; I never took the trouble to see whether or not it performed the work—he didn't have it hooked up and I couldn't see it. I guess maybe it would take two, three or four hours to hook it up. I didn't make an effort to hook it up to see; I didn't think it was necessary because he said his bakers wouldn't work with it. It wasn't over four months ago I went down there and he showed me the belt slipped and he had to put something on it. I never did hook it up to see whether it produced high speed bread after he said it did not. I cared about that because I was anxious to please my customers. I didn't do it because he said he couldn't keep a baker if he kept the machine. I don't remember that he ever said anything to me before that about it not producing high speed bread—he might have said it, but I don't remember it. I won't say that he didn't say that, he may have said it."

Mr. W. M. Berman, appellee's president and general manager, testified:

"With reference to the authority of Mr. Watts as salesman to bind the company on any warranties whatsoever, I will state that Mr. Watts works for me in the capacity of salesman. He has no authority to close any contracts. He has authority only to sell merchandise and represent it as represented, and all contracts and all orders are acceptable at the home office. If he takes a contract for the sale of merchandise it is submitted to the office for acceptance and if accepted, why, the merchandise is shipped.

"* * * Q. You don't know whether or not Mr. Watts represented that this was a high speed machine and you don't know whether or not it was a high speed machine?

"A. I never saw the machine in my life.

"I never took the trouble to investigate to see whether it was doing the work, for the simple reason that we had entered suit against Mr. Mikulik for payment of his account. I knew that he was not satisfied with it long before we entered suit. I never made an investigation to see what was wrong with it—I sent Mr. Watts to investigate it and I assume he did. Mr. Watts did not hook up the machine and try it out so far as I know.

"* * * I do not know whether this machine gave satisfactory results—I don't know a thing in the world about it, sir, and never took the trouble to investigate.

"The Artofex mixer gives high speed results; I think any machine that gives high speed results could be termed a high speed mixer.

"* * * I have seen the Artofex machine in actual operation and its product a number of times, and they turn out the same results as a high speed machine."

Appellee offered in evidence the chattel mortgage and sale contract, which contained the following special provisions, limiting the authority of its agent in making the sale: "We will not be responsible for any verbal agreement or any promise not in writing and embodied in this contract" and "deposit on orders submitted to Southwestern Specialty Company, Inc., for approval." On conclusion of the evidence the jury was instructed to return its verdict in favor of appellee, which was done, and judgment entered thereon in favor of appellee for the relief prayed for. The appeal was by Mikulik to the San Antonio Court of Civil Appeals, transferred to this court by order of the Supreme Court.

## Opinion.

The instructed verdict was error. The issue pleaded by appellant by his cross-action that the machine delivered to him was not the machine contracted for has support in the evidence. Under his pleading and proof, appellant wanted and needed in his trade a high-speed mixer; appellee's agent was fully advised of these facts, and represented to appellant that the machine sold to him was a high-speed mixer, and was the very machine he needed in his business; not being a practical baker, appellant relied upon this statement by the agent, and purchased the machine because of his faith and confidence in the representations made by the agent. Appellant pleaded that Watts, appellee's agent who sold him the machine, had authority to make these representations. This allegation has support in the evidence. Thus Mr. Berman, appellee's president and general manager, testified that Mr. Watts had authority from appellee to sell machinery "and represent it as represented." Mr. Watts testified that about a week before the sale was made he furnished appellant with a catalogue that represented the machine as giving the same results "as a high speed machine." Mr. Berman testified further: "The Artofex mixer gives high speed results; I think any machine that gives high speed results could be termed a high speed machine." Under appellant's testimony, the issue was clearly raised that the machine delivered him did not give high-speed results, and that it was not a high-speed machine.

The testimony also raised the issue of fraud against appellee in making these representations. Notwithstanding the representations testified to by appellant, and the extent of Mr. Watts' authority, as testified to both by Mr. Watts and Mr. Berman, and that the machine failed in every respect to comply with the special requirements upon which appellant made the purchase, yet neither Mr. Watts nor Mr. Berman made any effort whatever to examine the machine, to determine the character of work it would do, or to give appellant any adjustment whatever on the defects developed by the machine.

▓▓ Of course, if appellee contracted to sell, and appellant contracted to buy, a high-speed mixer, appellant was entitled to a high-speed mixer, and, if his testimony was true, was entitled to rescind the contract as against the machine that was actually delivered him. On the facts stated the issue was raised that appellant had the right to rescind the contract, return the machine and recover back what he had paid. Riley v. Atmar (Tex. Civ. App.) 213 S. W. 682; Shepherd Laundries Co. v. Griffin (Tex. Civ. App.) 285 S. W. 683; George v. Birchfield (Tex. Civ. App.) 264 S. W. 632; Edward Thompson Co. v. Sawyers, 111 Tex. 374, 234 S. W. 873; J. B. Colt Co. v. Wheeler, 12 S.W.(2d) 1102, by this court, wherein the principal authorities cited by appellee are reviewed.

▓ Appellee insists that the judgment of the lower court should be affirmed, first, because Watts was not authorized to make the representations pleaded by appellant against him, and under the provisions of the sale contract quoted above appellant was advised of this special limitation upon Watts' authority. From the quotations made above, from the pleadings of appellee, it appears that these special provisions of the sale contract were not pleaded; that the issue made by appellee's supplemental petition was that "Watts did not have any authority whatsoever to bind the plaintiff herein on any warranty for the work to be done by said above described machine." Under this pleading the issue was, as already stated by us, the extent of Watts' actual authority, and, on the

testimony both of Mr. Watts and Mr. Berman, the actual extent of his authority as to these representations was a question for the jury. Not only did appellant plead representations by Mr. Watts as to the character of work the machine would do, but also as to the nature of the machine, that is, that it was a high-speed mixer, and appellee's supplemental petition did not put in issue the agent's authority to make this representation except under the general denial. But on the issue of rescission, that is, whether or not appellant assented to buy the machine delivered, and whether or not appellee was advised of the character of machine appellant thought he was buying, appellant's answer and cross-action were sufficient to afford a basis for the introduction of the testimony offered. See authorities cited above. Second, appellee insists that the judgment should be affirmed for the following additional reasons: (a) It was not shown that the machine was absolutely worthless; (b) nor that appellant suffered any pecuniary damage. There is no merit in these contentions. One who is entitled to avoid an entire written contract because it lacked his assent, as the issue was raised in favor of appellant in this case, under his allegations and proof, can no longer be held bound by any of its stipulations or guaranties which induced its execution. This statement is taken from the opinion of Mr. Justice Greenwood, in Edward Thompson Co. v. Sawyers, supra. That appellant raised in his favor the issue of rescission clearly distinguishes this case from Wright v. Davenport, 44 Tex. 164, cited by appellee in support of these two propositions.

For the reasons stated, the judgment of the lower court is reversed, and the cause remanded for a new trial.

Reversed and remanded.